# EXHIBIT A

## **SCHEDULE A**

### **Definitions**

1.      Unless otherwise specified, all terms shall be interpreted as they are used in the Federal Rules of Civil Procedure.  The requests and terms used herein shall be construed to require the fullest and most complete disclosure permitted by law.

2.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure, and includes, without limitation, any book, bill, calendar, chart, check, compilation, computation, computer or network activity log, correspondence, data, data compilation, database, diagram, diary, document, draft, drawing, e-mail, electronic message, file, folder, film, graph, graphic presentation, image, index, inventory, invoice, jotting, journal, ledger, machine readable material, map, memoranda, metadata, minutes, note, order, paper, photograph, printout, recording, report, software, spreadsheet, statement, sound recording, summary, telephone message record or log, transcript, video, voicemail, voucher, webpage, work paper, writing, worksheet, or any other item or group of documentary material or information, regardless of physical or electronic format or characteristic, and any information therein, and copies, notes, and recordings thereof. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.  A draft or non-identical copy is a separate item within the meaning of these terms.

3.      "Communication" or "correspondence" means any transmission of information by one or more persons and/or between two or more persons by any means including, but not limited to, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail, computer linkups, written memoranda, notes and face-to-face conversations.

4.    "Person" means any natural person or legal entity, including individuals, corporations, businesses, firms, joint ventures, partnerships, sole proprietorships, governments, agencies or instrumentalities of governments, unincorporated associations, and cooperatives.

5.    A document or communication "relating to", "related to" or "concerning" any given subject matter means, without limitation, any document or communication that constitutes, comprises, contains, embodies, reflects, identifies, states, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified, irrespective of whether the document or communication tends to prove or disprove the particular subject matter.

6.    "Keystone Symposium" means the symposium entitled "The Microbiome," which took place between March 4 and 9, 2012 in Keystone, Colorado.

### Instructions

1.    These requests shall be deemed to include any and all relevant documents within your possession, custody or control.

2.    Documents from any single file should be produced in the same order as they were found in such file.

3.    If any document responsive to these requests has been destroyed or transferred to another person not under your control, describe the content of said document, the location of any copies of said document, the date of such destruction or transfer and the name of the person who ordered or authorized such destruction or transfer.

4.    If you find the meaning of any term in these document requests to be unclear, you should assume a reasonable meaning, state what the assumed meaning is, and produce documents on the basis of that assumed meaning.

5.      With respect to any documents otherwise responsive to this request that you withhold or refuse to divulge on a claim of privilege, provide a statement signed by your attorneys setting forth as to each document:

      a.   the names of the sender, author and recipient of the document and any persons to whom the document was shown;

      b.   the date of the document, or if no date appears, the date on which it was prepared;

      c.   a general description of the nature and subject matter of the document;

      d.   the name of the person who has custody of the document; and

      e.   the statute, rule or decision which is claimed to give rise to the privilege.

6.      "Including" shall be construed broadly, "including but not limited to" or "including without limitation."

## Document Requests

1.      Documents relating to attending the Keystone Symposium, including but not limited to any records of attendance, any materials obtained at the Keystone Symposium, notes taken during the Keystone Symposium, communications with anyone concerning the Keystone Symposium and any other documents reflecting any information obtained at the Keystone Symposium.

2.      Documents relating to any communications with Professor Cani or Professor Everard at or after the Keystone Symposium, including but not limited to any notes or records of those communications, communications with anyone concerning those communications, and any other documents reflecting any such communications.

3.      Documents relating to any communications with anyone at the Keystone Symposium concerning the bacterium *Akkermansia*, including but not limited to any notes or records of those communications, communications with anyone else concerning those communications, and any other documents reflecting any such communications.

4.      Documents relating to any communications with any individuals named on the face of US patent application 61/604,834 or PCT/US2013/028271or any individuals involved with the prosecution of those patents concerning the bacterium *Akkermansia* at any time during or after the Keystone Symposium.

5.      Documents relating to the inclusion of the bacterium *Akkermansia* in US 61/604,834, including but not limited to any documents showing any awareness of the properties of *Akkermansia*, any testing done with respect to *Akkermansia,* and any communications concerning *Akkermansia.*

6.      Documents relating to the decision to include *Akkermansia* in testing used in PCT/US2013/028271, including but not limited to any reasons for its inclusion and any communications or discussion with your co-inventors or any other individual relating to that decision.

7.      Documents relating to any testing performed concerning the bacterium *Akkermansia* described in PCT/US2013/028271, including but not limited to the timing and conduct of that testing, the results of those tests, and any communications or discussion with your co-inventors or any other individual relating to that testing.

# EXHIBIT B

Emmanuel DEBRAY

Quentin DEBRAY

*Huissiers de justice*
*Judicial Officers*

Barbara MEIRSSCHAUT
*Master of Laws, LL.M.*

Joachim JANSSENS de VAREBEKE
*Master of Laws*

*Candidats Huissier de Justice*
*Junior Judicial Officers*



**DEBRAY** & ASSOCIATES

HUISSIERS DE JUSTICE
GERECHTSDEURWAARDERS

**Val des Seigneurs 15 Herendal**
**Bruxelles 1150 Brussels**

EDKD Srl/Bv
Crossroads Bank for Enterprises: 0479.100.321

*Etude ouverte/Office open*
8:00 a.m. – 12:00 p.m. & 1:30 p.m. – 4:30 p.m.

Tel.: +32 (0)2 772 81 92
Fax: +32 (0)2 772 92 72

*etude@debray.be / kantoor@debray.be*

Comptes tiers/Trust accounts:
BE64 1919 5165 6252 BIC CREGBEBB
BE23-0000-2847-8691 BPOTBEB1

 

Numéro de dossier : 197928 - JD
*Référence à rappeler en cas de paiement : 003/0097/92889*
Ref. avocat/requérant :

||||||||||||||||||||||||||||||||||||||||||||
197928_10202_1745218

**TRANSLATION**

## SUMMONS TO APPEAR BEFORE THE COURT

### DATE OF SERVICE OF THE SUMMONS

**The year two thousand and twenty-two, on October twenty-eight**

### IDENTITY OF THE PLAINTIFF & ITS COUNSEL

**At the request of:**

The private limited liability company **THE AKKERMANSIA COMPANY**, registrered with lthe BCE under number 0664.529.083, with his registrered office at 1435 MONT-SAINT-GUIBERT/Belgium, Rue Granbonpré, 11,

Acting, in its capacity as <u>agent</u> (*mandataire*), in the name and on behalf of:

- The legal entity under Dutch public law **WAGENINGEN UNIVERSITY**, located at Droevendaalsesteeg 4, 6708 PB Wageningen, the Netherlands and registered with the Dutch Chamber of Commerce under number 09215846;
- The legal person under private law pursuing a public purpose **UNIVERSITÉ CATHOLIQUE DE LOUVAIN**, established Place de l'Université 1, 1348 Louvain-La-Neuve/ Belgium and registered with the Crossroads Bank for Enterprises under number 0419.052.272, hereinafter "**UCL**";
- Mr **Patrice CANI,** domiciled at Avenue des Constellations 14, 1200 Brussels/ Belgium, national register number 771226-25980;
- Ms **Amandine EVERARD,** domiciled in Avenue Del Copette 14, 1325 Dion Valmont/ Belgium, national registration number 870418-23810 ;
- Ms **Clara BELZER,** domiciled at Hendrikweg 19, 6703 AV Wageningen, the Netherlands, Dutch passport number NSF7JBBP9 ;
- Mr. **Willem DE VOS,** domiciled at Oude Bennekomsweg 77, 6717 Ede, the Netherlands, Dutch passport number NS07H55H6 ;

Having for counsel **Master CAMPOLINI Philippe and Master BIDAINE Louis**, lawyers, whose office is established at rue de Loxum, 25, 1000 Brussels, Belgium (@. louis.bidaine@stibbe.com)

### IDENTITY OF THE PROCESS SERVER ISSUING THE SUMMONS

I, the undersigned, Joachim JANSSENS de VAREBEKE, substituting process server replacing Emmanuel DEBRAY/Quentin DEBRAY, Process Server with location of practice at Val des Seigneurs 15, 1150 Woluwe-Saint-Pierre/BELGIUM

**IDENTITY OF THE DEFENDANT & method of service of the writ**

**served SUMMONS on:**

1/ **ETHICON ENDO-SURGERY company incorporated under foreign law**, with its offices established at

  A) US-COLUMBUS OH 43219/ UNITED STATES OF AMERICA, 4400 Easton Cmns

  B) US-BLUE ASH, OH 45242\ UNITED STATES OF AMERICA, 4545 Creek Road,

2/ **THE GENERAL HOSPITAL CORPORATION company incorporated under foreign law**, with its offices established at US-BOSTON, MA 02114 \ UNITED STATES OF AMERICA, 55 Fruit Street,

3/ **PRESIDENT AND FELLOWS OF HARVARD COLLEGE company incorporated under foreign law**, with its offices established at US-CAMBRIDGE, MA 02138 \ UNITED STATES OF AMERICA, 17, Quincy Street,

And in order to inform **the addressees supra 1 to 3** of this procedural document, given that they seem to have their offices/registered offices in the UNITED STATES OF AMERICA and to my knowledge they do not have a place of business, establishment unit or elected address for service in Belgium, I have applied the International convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, concluded at The Hague on 15 November 1965, and I have sent, **for each of them**, by registered letter with acknowledgement of receipt handed over this day to the postal services in Brussels/Belgium:

1. a request, completed in French and English, corresponding to the model form appended to the said Convention;
2. two copies of my procedural document, each copy accompanied by:
    a) a form that sets out the nature and purpose of the judicial document, drawn up in French and in English,
    b) a translation into English of the said procedural document,
3. with a payment of $US 95 for the delivery to each one of the addressees

to the Central Authority designated by the State where the addressee resides, namely:

**ABC Legal Services**
**633 Yesler Way**
**Seattle, WA 98104**
**Etats-Unis d'Amérique**
https://www.abclegal.com/international-service-of-process

With the request to serve **to each one of the addressees** referred to in greater detail above:

1. one of the copies of my procedural document, accompanied by the form that sets out the nature and purpose of the judicial document and its translation, in accordance with the law of the State in which the addressee resides, in application of Article 5, para. 1, letter A of the said Convention,

2. to return to me the other copy, accompanied by the certificate as contained in Article 6 of the above-mentioned Convention, mentioning the execution of my request, the method, the place and the date of service, as well as the person to whom the writ has been delivered, or in the alternative, details of the circumstances which prevented the execution of my request as above.

And I have attached the proof of delivery of the registered letter to the original of my present writ.

And given that the UNITED STATES OF AMERICA do not object to the service of judicial documents by post, I have sent to the **addressees referred to in greater detail above** – for each of them separately – in accordance with the requirements of Article 10 of the said Convention, a copy of my present writ accompanied by its appendices and a translation thereof in English, by registered letter with acknowledgement of receipt.

accompanied by its appendices and a translation thereof in English, by registered letter with acknowledgement of receipt.

And I have attached the proofs of delivery of the registered letters to the original of my present writ.

**IDENTIFICATION OF THE RELEVANT COURT (place, date and time of appearance)**

To appear on **WEDNESDAY, THE EIGHTH OF MARCH 2023 at 9:00 a.m.** before the second chamber of the French-speaking Enterprise Court of Brussels, at a hearing to be held in the ordinary hearing room, Courtroom A, Boulevard de Waterloo 70 à 1000 BRUSSELS (Belgium)

**GROUNDS FOR THE SUMMONS (legal argument of the claimant)**

## 1    The facts

### 1.1    The bacterium *Akkermansia muciniphila*, its history and usefulness

1.      The bacterium of the species *Akkermansia muciniphila* is at the heart of this dispute. It is useful to briefly outline its history and utility in order to understand the developments that follow.

In 2004, the bacterium *Akkermansia muciniphila* was identified and characterised by Dr. Muriel Derrien in the laboratory of Professor Willem de Vos, attached to Wageningen University in the Netherlands (see in particular exhibits C.1 and E.2). This bacterium contributes significantly to the health of the intestinal flora. It represents about 3% of the bacteria present in humans in the colon, the middle part of the large intestine. This makes it one of the most represented species of bacteria in our body. Among other things, it stimulates the immune system and the growth of natural intestinal bacteria, which prevents pathogenic bacteria from multiplying in the intestinal tract and causing various diseases.

In a research project conducted between 2008 and 2013, the teams of Prof. de Vos (including Dr. Clara Belzer and Dr. Janneke Ouwerkerk) and Prof. Cani (including Prof. Everard[1] and Dr. Lucie Geurts) joined forces. They succeeded in demonstrating the efficacy of administering the bacterium *Akkermansia muciniphila* in the prevention of intestinal barrier dysfunction, in the treatment of obesity, diabetes and related metabolic disorders in obese subjects.

In the course of their research, they discovered a link between the population density of the *Akkermansia muciniphila* bacteria in the colon, obesity and intestinal inflammation. Their studies, conducted initially on mice, revealed a sharp decrease in the number of intestinal bacterial cells in obese subjects suffering from type 2 diabetes. Their overweight was then reduced after administration of the *Akkermansia muciniphila* bacteria. It was also found that the pasteurised[2] form of this bacterium is more effective than the live form for administration for these therapeutic purposes.

---

[1] Still a doctoral student at the time.
[2] Pasteurisation is a process that involves heating strains above a certain temperature.

**In 2015,** the said bacterium started to be produced on a large scale and a clinical study on humans (Microbes4U) was launched.

**In 2019,** the results of Microbes4U were published in the journal *Nature Medicine*. This is the first randomised, double-blind, placebo-controlled pilot study in volunteers. It demonstrates that daily intake of pasteurised *Akkermansia muciniphila* bacteria for 3 months is safe, well tolerated and reduces cardiometabolic risk factors (pre-diabetes, hypercholesterolemia and low-grade inflammation).

**In 2020,** a study demonstrated the toxicological safety of the pasteurised form of the bacteria.

The above is a summary statement, several aspects of which are detailed further in this quotation, notably **in points** Erreur ! Source du renvoi introuvable. **and following**.

## 1.2    Presentation of the applicant and its constituents

2.       Wageningen University and UCL are internationally renowned universities. These are the universities to which Prof. de Vos, Dr. Belzer and Dr. Ouwerkerk belong, and Prof. Cani, Dr. Everard and Dr. Geurts belong to the latter.

Various patents have been filed by UCL and Wageningen University (**"the Universities"**), as successors in title to Prof. de Vos, Prof. Cani and Prof. Evrard and Dr. Belzer, in relation to the *Akkermansia muciniphila* bacterium.

The above four persons are hereinafter referred to as the **"Inventors"**.

3.       The Akkermansia Company (**"TAC"**) is a Walloon company founded in 2016 by professors Cani and de Vos. It is a "spin-off" founded in the wake of the studies and results obtained on the bacteria.

4.       TAC has obtained, through an exclusive license agreement of June 6, 2017 with the Universities, a significant portfolio of intellectual property rights covering the composition of products containing the bacterium, its therapeutic uses as well as a method of culturing the bacterium.

TAC's purpose is to develop, manufacture and market products containing the bacterium. **On 8 February 2022,** TAC received authorisation to market a first food supplement based on the bacterium *Akkermansia muciniphila*. In the Benelux, this supplement has been distributed on an exclusive basis since September 2022 by Metagenics (**exhibit E. 3**). The supplement is indicated for weight and blood glucose management.



5.      For organizational reasons, the Universities and the Inventors have mandated TAC to bring the present proceedings in their name and on their behalf (Exhibit E.1). As will be explained below, the Universities' and the Inventors' action essentially seeks to claim co-ownership and co-inventorship, respectively, of the patent application EP 2,836,224, which arises from an international patent application filed in fraud of their rights by the named parties.

## 1.3    Presentation of the parties cited

6.      **Ethicon Endo-Surgery, Inc.** is a manufacturer and distributor of healthcare products and is part of the Johnson & Johnson international group.

**The General Hospital Corporation d/b/a Massachusetts General Hospital** is a large hospital in the United States.

**President and Fellows of Harvard College** is Harvard University in the United States.

The three parties mentioned above have in common that they are co-owners of the fraudulently filed European patent application number EP 2 836 224 (hereinafter the "Litigious Application"; Exhibit B.4) presented in the following section. 11 below.

## 1.4    Summary of the dispute

7.      As mentioned above, the bacterium *Akkermansia muciniphila* occurs naturally in the human gut and has advantageous pharmaceutical properties.

In view of the substantial investment they have made in the study of this bacterium, the Universities have filed patent applications on the discoveries made by the Inventors (section a).

However, the parties cited, to whom the research results were disclosed in confidence at a scientific symposium in March 2012, also unlawfully filed a patent application on these results (section b).

(a)     **Patenting by Universities**

8.      **On 19 November 2012**, the Universities filed an international patent application with the European Patent Office ("EPO"). The application is numbered PCT/EP2012/073011 and was published on 22 May 2014 as application number WO 2014/075745 (Exhibit A.1). This is the "**First International Application**". This application relates to the results obtained by Prof. de Vos, Prof. Cani and Prof. Evrard and Dr. Belzer, i.e. the Inventors.

9.      **On 15 November 2013**, a second international patent application PCT/EP2013/073972 was filed. It was published on 22 May 2014 as WO2014/076246 (Exhibit A.2). It claims a priority date of 19 November 2012, i.e. the filing date of the First International Application. This is the "**Second International Application**". The named inventors are the same as in the First International Application.

This Second International Application resulted, inter alia, in the grant, on 28 April 2021, of European Patent EP 2 919 796 B1 (Exhibit A.3). The patent is entitled "*Use of akkermansia for the treatment of metabolic disorders*". This European patent contains 21 claims which disclose, in particular, the use of the bacterium in the treatment of certain diseases including obesity and type II diabetes.

(b)    Confidential presentation of results to the parties mentioned and subtraction of these results by the same parties

10.    On 6 March 2012, shortly before the Universities filed the first PCT/EP2012/073011 application, Prof. Cani and Prof. Everard confidentially presented the results of their studies on the bacterium *Akkermansia muciniphila*.

This presentation was given to a small group of colleagues by means of a poster presentation at the international symposium "The Microbiome" held from 4 to 9 March 2012 in Keystone, Colorado, USA. The poster presentation is included as exhibit C. 22.

The audience for this presentation included Dr Alice P. Liou. She had just finished her PhD thesis and was employed by The General Hospital Corporation d/b/a Massachusetts General Hospital (the second party mentioned) as a post-doctoral fellow. After the presentation, she discussed with Prof. Cani the studies presented and the results around the bacterium *Akkermansia muciniphila*.

The confidentiality of this disclosure is based on the following facts, among others

- The Keystone Symposium is a closed event where only registered participants can attend the presentations;

  Attendees will be required to wear name badges for access to meeting sessions. Due to problems we have encountered at some meetings, we will be performing random badge checks. Attendees without badges will be turned away from the session.

  (page 5 of Exhibit C.22)

- The public may not record, film or photograph anything during the presentations;

  No video equipment, cameras, audio equipment or any other type of recording device will be allowed in the meeting rooms or poster sessions. While we do not prohibit laptop computers, cell phones and PDAs, they must not be used for recording and should be operated in "silent" mode out of consideration for speakers and other conference attendees.

  (page 5 of Exhibit C.22)

- Scientific results may not be disclosed publicly without the prior consent of the authors.

  We ask that all writers attending a Keystone Symposia conference gain approval from a speaker or poster presenter prior to quoting or publishing that individual's scientific results. This policy applies whether you are a professional writer/journalist or a non-journalist blogging about the conference or otherwise sharing information among a group of individuals.

  (page 6 of Exhibit C.22)

11.    The results presented by Prof. Cani and Prof. Everard were, however, included in an international patent application PCT/US2013/028271 filed on 28 February 2013 by the cited parties and published on 6 September 2013 as WO 2013/130773 (exhibit B. 2). The alleged inventors mentioned are Lee M. Kaplan, Alice P. Liou, Peter J. Turnbaugh and Jason L. Harris.

In order to be granted a patent, an international patent application must enter a regional or national phase, i.e. it must be examined by either a regional patent office (such as the EPO) or a national patent office (such as the USPTO in the United States of America) in order to verify that the invention meets the requirements for patentability. If it does, the patent is granted by that office. In the present case, the international patent application

PCT/US2013/028271 moved to the European phase on 26 September 2014 to give rise to the Litigation Application.

12.     The results presented by Prof. Cani and Prof. Everard were also incorporated into a US patent application which had been filed prior to the Keystone Symposium, but which was substantially amended <u>following the</u> Keystone Symposium to incorporate the findings. The patent application in question is US patent application number US 61/604,824 filed on 29 February 2012 by the first two named parties (hereinafter the "US Application"). The inventor named in this application is Jason L. Harris. The U.S. Application was adapted after Keystone's submission to incorporate said results as will be detailed in points 29 and following.

The Litigation Application claims the priority date of the US Application, i.e. 29 February 2012, a few days before Keystone's submission on 6 March 2012.

To the best of my knowledge, no patent has yet been granted to the parties mentioned.

The filing of the Disputed Application violated the rights of the Inventors and the Universities. The purpose of these proceedings is to obtain recognition of the Inventors' inventorship and the Universities' co-ownership rights in the Disputed Application.

The amendment of the US Application also violated the rights of the Inventors and the Universities. Proceedings are underway in the United States to safeguard the rights of the Inventors and the Universities. The purpose of these proceedings is to determine which of the Inventors or persons named in the U.S. Application first made the invention (see in particular exhibits C.23 to C.28).

## 2      the LAW

### 3.1      Your court has jurisdiction [means 1]

13.      TAC was initially instructed to institute proceedings to claim the Litigation Application (EP 2 836 224) on behalf of the Inventors and the Universities before the *Verwaltungsgericht* in Munich, Germany. These proceedings were commenced and TAC informed the EPO in order to have the grant of the patent suspended (**Exhibit D.1**) under Rule 14(1) of the Implementing Regulations of the EPC which provides that :

> *"If a third party provides evidence that he has instituted proceedings against the applicant for the purpose of obtaining a decision under Article 61(1)[3] , the grant procedure shall be suspended, unless the third party declares in writing to the European Patent Office that he consents to the continuation of the proceedings. Such consent shall be irrevocable. However, the grant procedure shall not be suspended until the European patent application has been published.*

However, the EPO considered that the *Verwaltungsgericht* of Munich did not have jurisdiction to hear the claim and rejected the request for suspension (**Exhibit D.2**). In particular, the EPO considered that :

> *" 2. According to Article 3 of the Protocol on Jurisdiction and the Recognition of Decisions Relating to the Grant of a European Patent (Recognition Protocol), if an applicant has his residence or principal place of business outside the Contracting States, and if the party claiming the right to the grant of the European patent has his residence or principal place of business in one of the Contracting States, the courts of the latter State shall have exclusive jurisdiction.*
>
> *The applicants for the above European patent application have their residence or principal place of business in the United States of America, outside the Contracting States of the EPC. Akkermansia, the party claiming the right to the grant of the European patent, has its residence or place of business in Belgium, in one of the Contracting States of the EPC.*
>
> *The proceedings in this case were initiated before the Verwaltungsgericht in Munich, Germany. However, as the applicant has his residence or principal place of business in Belgium, it is appropriate to initiate a habilitation procedure in Belgium in accordance with Article 3 of the Recognition Protocol. (...)*
>
> *4. Since the requirements of Rule 14(1) EPC are therefore not fulfilled, the Legal Division considers that the proceedings before the EPO cannot be suspended in respect of the above-mentioned European patent application.[4] "*

---

[3] Which provides that: "*If a final decision has recognised the right to obtain a European patent to a person other than the applicant, that person may, in accordance with the Implementing Regulations: a) continue, in place of the applicant, the proceedings relating to the European patent application, taking over that application, b) file a new European patent application for the same invention, or c) request the rejection of the European patent application.* "

[4] Free translation of : " *2. Pursuant to Article 3 of the Protocol on Jurisdiction and the Recognition of Decisions in respect of the Right to the Grant of a European Patent (Protocol on Recognition), if an applicant has his residence or principal place of business outside the Contracting States, and if the party claiming the right to the grant of the European patent has his residence or principal place of business within one of the Contracting States, the courts of the latter State shall have exclusive jurisdiction.*

Article 3 of the Protocol states that:

> "Subject to Articles 4 and 5, where the proprietor of a European patent application has neither his domicile nor his seat in any of the Contracting States, and where the person claiming the European patent has his domicile or seat in one of the Contracting States, the courts of the latter State shall have exclusive jurisdiction.

14.     The EPO's reasoning is wrong insofar as TAC was only acting as agent for the Universities and the question of international jurisdiction was therefore to be assessed in relation to the parties represented by TAC. However, as the represented parties were not German either, it is correct that German courts do not have jurisdiction. Since one of the two universities asserting the right to obtain the European patent, namely UCL, is established in Belgium, the Belgian courts have jurisdiction to hear the claim in accordance with Article 3 of the above-mentioned Protocol. The same applies to the Inventors' claim for recognition as inventors, which is inseparable from the Universities' claim. The proceedings before the *Verwaltungsgericht* München were therefore withdrawn by TAC on 22 September 2022 (**Exhibit D.3**), and the present proceedings were subsequently instituted.

15.     From the point of view of **domestic jurisdiction**, your court has jurisdiction to hear the said claims, this time by virtue of Article XI. 337, §1<sup>er</sup> of the CDE, which provides that: "*without prejudice to the jurisdiction of the unified patent court referred to in Article 32, paragraph 1<sup>er</sup> , of the Agreement on a Unified Patent Court, the Brussels Company Court shall hear all applications relating to patents or supplementary protection certificates, irrespective of the amount of the claim.*

## 3.2     The Universities and the Inventors have standing and interest in the case [plea 2].

16.     The Universities and the Inventors have given TAC a special mandate to bring this proceeding in their name and on their behalf (**Exhibit E.1**).

A civil procedure is a legal act that can be the subject of a mandate contract under Articles 1984 et seq. of the Civil Code. Such a mandate is called a mandate *ad agendum*. In a judgment of 26 March 2002, the Court of Cassation recalled[5] that: "*whereas any person with legal personality may act in justice on behalf of a third party provided that he has a special mandate for this purpose, the existence of which he discloses at the same time as the name of his principal.*

As the agent acts in the name and on behalf of the principals, the standing and interest to act must be assessed on behalf of the principals. The Inventors requesting that their status as co-inventors of the invention claimed by the Litigation Application (EP 2 836 224) be recognised, it is obvious that they have standing and interest to act. The

---

*The applicants of the above identified European patent application have their residence or principal place of business in the United States of America, outside the Contracting States to the EPC. The Akkermansia Company, the party claiming the right to the grant of the European patent, has his residence or place of business in Belgium, within one of the Contracting States to the EPC.*
*Proceedings in this case have been brought before the Verwaltungsgericht Munich in Germany. However, as the claimant has his residence or principal place of business in Belgium, entitlement proceedings should be brought against the applicant in Belgium in accordance with Article 3 of the Protocol on Recognition. (...)*
*4. As the conditions of Rule 14(1) EPC are consequently not fulfilled, the Legal Division considers that the proceedings before the EPO cannot be stayed with respect to the above-mentioned European patent application.*
[5] *Pas, 2002, p. 815.*

same applies to the Universities which, as successors in title to the Inventors, claim co-ownership of the same Litigation Application.

### 3.3 The Inventors must be recognized as co-inventors of the disputed Application and the Universities as co-owners [means 3].

**(a)      Reminder of the principles**

17.      **Applicable law** - Before anything else, the law applicable to the Inventors' and Universities' claims must be determined.

Article 60(1)$^{er}$ of the European Patent Convention (EPC) provides that :

> *"The right to the European patent shall belong to the inventor or his successor in title. If the inventor is an employee, the right to the European patent shall be defined according to the law of the State in which the employee carries on his main activity; if the State in which the main activity is carried on cannot be determined, the applicable law shall be that of the State in which the establishment of the employer to which the employee is attached is located."*

Article 93 of the Code of Private International Law provides that:

> *"Intellectual property rights are governed by the law of the State for whose territory protection of the property is sought.*
>
> *However, the determination of the original owner of an industrial property right shall be governed by the law of the State with which the intellectual activity is most closely connected. Where the activity takes place in the context of contractual relations, it shall be presumed, in the absence of proof to the contrary, that that State is the State whose law is applicable to those relations.*

The present claim is based on contributions to an invention made by two Belgian professors (P. Cani and A. Everard), a Dutch professor (W. de Vos) and a Dutch doctor (C. Belzer).

**Conclusion** - Belgian law should therefore be applied as regards the contributions of Belgian inventors and Dutch law as regards the contributions of Dutch inventors.

18.      **Applicable Belgian law** - The relevant provisions under Belgian law are Articles XI.9, XI.10 and XI.13 of the Code of Economic Law ("CEL") and Articles 61 and 62 of the EPC.

Article XI.9 provides that *"the right to the patent shall belong to the inventor or his successor in title"*. This rule is identical to that in Article 61(1)$^{er}$ of the EPC.

Article XI.10 provides that: *"§ 1$^{er}$ If a patent has been applied for either for an invention which has been taken away from the inventor or his successors in title, or in violation of a legal or contractual obligation, the injured party may, without prejudice to any other rights or actions, claim the transfer of the application or the patent granted as proprietor.*

*§ 2 If the injured party is entitled to only a part of the granted application or patent, he may, in accordance with the provisions of paragraph 1er , claim the transfer as joint proprietor. (...) "*

Article XI.13 provides that: *"The inventor shall be mentioned in the patent, unless he expressly requests otherwise. In the EPC, Article 62 also provides that: "The inventor shall have the right, as against the proprietor of the European patent application or the European patent, to be named as such before the European Patent Office.*

The inventor is the person who has made or contributed to making the invention. This is necessarily a natural person. If the invention is made by several persons, each of them must be considered as an inventor, and be mentioned as such in the patent (and in the application which precedes it).

The right to obtain the patent belongs initially to the inventor(s), if any. The inventor(s) may, however, assign their right to obtain the patent to one or more other natural or legal persons.

To qualify as an inventor, the person must have made the invention or provided a substantial contribution to it, i.e. a contribution that must have concretely contributed to the development of the invention.

The Court of Cassation ruled in particular in a judgment of 18 November 2016 that:

> *"According to Article 9, §1, of the same law* [= current Art. XI.10, §1, CDE], *if a patent has been applied for either for an invention which has been taken away from the inventor or his successors in title, or in violation of a legal or contractual obligation, the injured party may, without prejudice to any other rights or actions, claim the transfer of the application or the patent granted as proprietor.*
>
> *According to Article 9, §2 of the same law* [= current Art. XI.10, §2, CDE], *if the injured party is only entitled to a part of the granted application or patent, he may, in accordance with the provisions of §1, claim the transfer of the same as joint proprietor.*
>
> *11. Any person who has made a genuine intellectual and creative contribution to the making of an invention within the meaning of Article 2(1) of the Patent Law of 28 March 1984 shall be considered a joint proprietor of the patent. In this respect, it is not required that the contribution itself meets all the legal requirements of a patentable invention.*[6]

In a judgment of 18 October 2013, the Antwerp Commercial Court further ruled that:

> *"What this substantial contribution is depends on the circumstances of the case, but this notion will of course have to be assessed on the basis of what is indicated in the patent claims (as essential features of the invention). In this respect, it is not the importance (size) of the contribution that counts, but its intrinsic significance in the light of the claimed invention.*

---

[6] *Not.* , p. 2231.

*In the doctrine, the notion of 'substantial contribution' has already been interpreted with reference to 'a real creative and intellectual contribution' (cf. F. GOTZEN and M.-C. JANSSENS, o.c., 199).*

*The substantiality, or importance of the contribution, must be assessed in the light of the conceptual level of the claimed invention. The fact that it may be of too high a level to meet the requirements of patentability is, at this stage of the assessment, irrelevant (see Interpretation of the notion of 'invention' and the technical contribution requirement).*

*The higher the conceptual level (which usually goes hand in hand with a broad level of protection), the lower the threshold of 'substantiality', or rather of its intrinsic meaning in light of the claimed invention, to qualify as a 'contribution'. In other words, the higher the conceptual level of an invention, the more general the contribution can be to be considered substantial enough to qualify as an inventor"[7].*

19.     **Applicable Dutch law** - The principles applicable under Dutch law are, in substance, identical to those of Belgian law. Reference should be made to the *Rijksoctrooiwet* of 15 December 1994 as interpreted by case law.

Article 11 of this law states: *"The applicant shall have no right to a patent to the extent that the contents of his application are derived from what has already been made or applied by another person or from descriptions, designs or models of another person, without his consent. The latter retains his right to the patent to the extent that what has been derived is patentable. For the purposes of applying Article 4(3) and (4) to the subject matter of an application filed by the person from whom the subject matter has been taken, the application filed by the person who took it away shall not be taken into consideration.*[8]

---

[7] Comm Antwerp, 18 October 2013, *I.R.D.I* 2014, pp. 381 et seq. Free translation of: *"Waar deze substantiële bijdrage in bestaat, is afhankelijk van de omstandigheden van het geval, doch zal uiteraard dienen ingevuld te worden aan de hand van wat vermeld wordt in de octrooi-conclusies (als essentiële kenmerken van de uitvinding). Hierbij is het niet van belang hoe groot de bijdrage is doch wel de inhoudelijke betekenis ervan in het licht van de opgeëiste uitvinding. In de rechtsleer wordt m.b.t. de invulling van het begrip "substantiële bijdrage" melding gemaakt van "een daadwerkelijke creatieve en intellectuele inbreng" (cf. F. GOTZEN en M.C.C. JANSSENS, o.c., 199). Het substantieel karakter, beter het belang van de bijdrage, dient beoordeeld te worden in het licht van het conceptueel gehalte van de opgeëiste uitvinding. Indien deze van al hoog gehalte zijn om te voldoen aan de octrooieerbaarheidsvoorwaarden is in deze stand van beoordeling niet van belang (cf. de invulling van het begrip "uitvinding" en de voorwaarde van technische bijdrage). Hoe hoger het conceptueel gehalte (meestal samengaand met een uitgebreide beschermingsomvang), hoe lager de drempel van het "substantieel" gehalte, beter de inhoudelijke betekenis ervan, in het licht van de opgeëiste uitvinding zal worden gezet om te worden beschouwd als "bijdrage". Of nog anders: hoe hoger het conceptueel gehalte van een uitvinding, des te algemener kan de bijdrage zijn om te worden beschouwd als voldoende substantieel om als uitvinder te worden beschouwd."*
[8] Free translation of: *"De aanvrager heeft geen aanspraak op octrooi, voor zover de inhoud van zijn aanvrage aan hetgeen reeds door een ander vervaardigd of toegepast werd of wel aan beschrijvingen, tekeningen of modellen van een ander, zonder diens toestemming, ontleend is. Deze laatste behoudt, voor zover hetgeen ontleend werd voor octrooi vatbaar is, zijn aanspraak op octrooi. Voor de toepassing van artikel 4, derde en vierde lid, op het onderwerp van een aanvrage, ingediend door degene aan wie ontleend is, blijft de door de ontlener ingediende aanvrage buiten beschouwing."*

Article 78(1)[er] of that Act provides that: "*A patent may be claimed in whole, in part or in respect of a share thereof by a person who has a right or joint right to it under Articles 9, 10 or 11 or, in the case of a European patent, under Article 60(1)[er] of the European Patent Convention.*[9]

According to the case law, the status of co-inventor is thus attributed to persons who have made an effective contribution to the invention or to its essential elements[10].

20.    **Conclusion** - From the principles set out above, it follows that, in order to establish the merits of the Inventors' and Universities' claims, it must be established that Professors Cani, de Vos and Everard and Dr. Belzer made a substantial or actual contribution to the invention claimed in the Contested Application.

(b)    **Application**

21.    In this section, the invention claimed in the Contested Application will first be identified (i). Next, the work of the Inventors will be set out (ii). The invention and the Inventors' work will then be compared (iii). These developments will establish that the named parties have unlawfully removed the Inventors' invention and incorporated it without authorisation into their international patent application PCT/US2013/028271 and into the Contested Application (iv and v).

(i)    **Invention claimed by the Contested Application**

22.    As mentioned above, the Contentious Application is currently under examination by the EPO. Several exchanges of views have already taken place between the named parties and the EPO examiner. In particular, the claims of EP 2 836 224 have been amended by the named parties on eight occasions, the last amendment being on 28 June 2022 (**Exhibits B.4 to B.13**). The latest set of claims comprises one main claim and 17 dependent claims. It is this text which currently defines the invention claimed by the named parties and which must be relied upon to assess the merits of the claims made by the Inventors and the Universities.

23.    The main claim, as of 28 June 2022, reads as follows

"*A pharmaceutical form for use in a method of treating a metabolic disorder in a subject, wherein the treatment alters a microbiota in the subject, and wherein the pharmaceutical composition comprises*

*a) a therapeutically effective amount of a sample comprising Akkermansia, the sample comprising at least 50% Akkermansia, and*

*b) a pharmaceutically acceptable carrier,*

*in which the change in microbiota includes an increase of at least 5% in the relative abundance of Verrucomicrobiales in the subject's gastrointestinal tract;*

*in which the metabolic disorder is selected from the group consisting of: obesity, metabolic syndrome, insulin deficiency, diabetes mellitus, impaired glucose tolerance, diabetes, non-alcoholic fatty liver disease, dyslipidaemia and hypercholesterolaemia.*[11]

---

[9] Free translation of: "*Een octrooi kan geheel, gedeeltelijk of voor wat betreft een aandeel daarin worden opgeëist door degene die krachtens de artikelen 9, 10 of 11 dan wel, indien het een Europees octrooi betreft, krachtens artikel 60, eerste lid, van het Europees Octrooiverdrag aanspraak of mede aanspraak heeft op dat octrooi.*"
[10] See in particular Gerechtshof Den Haag, 22 February 2002, 200.156.630/02 and 200.156.625/02, https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:GHDHA:2022:862 points 11.46 *juncto* 11.33 (exhibits F.1 and F.2)
[11] *A pharmaceutical composition for use in a method of treating a metabolic disorder in a subject, wherein the treating alters a microbiota in the subject, and wherein the pharmaceutical composition comprises a) a therapeutically effective amount of a sample comprising Akkermansia, wherein the sample comprises at least 50% Akkermansia, and b) a pharmaceutically acceptable carrier,*

Claims 2 to 18 are all <u>dependent</u> on claim 1 and thus all implement the invention of claim 1. They are more precise (and thus more limited) variants of claim 1. Therefore, it is sufficient to establish that the invention covered by claim 1 is the result of work carried out by the Inventors for their contribution to the inventions covered by the dependent claims to be established as well.

24.      In substance, the invention of claim 1 is therefore characterised by the following features:

- A pharmaceutical form which comprises a therapeutically effective amount of a sample comprising Akkermansia, the sample comprising at least 50% Akkermansia together with a pharmaceutically acceptable carrier (Feature 1);
- For the treatment of any of the following metabolic disorders: obesity, metabolic syndrome, insulin deficiency, diabetes mellitus, impaired glucose tolerance, diabetes, non-alcoholic fatty liver disease, dyslipidaemia and hypercholesterolaemia (feature 2);
- The treatment includes the form altering a microbiota in the subject by increasing the relative abundance of Verrucomicrobiales in the subject's gastrointestinal tract by at least 5% (Feature 3).

**(ii)      The work of the Inventors**

25.      Folder C of my applicant's file includes, in particular, some twenty documents from the period drawn up *in tempore non suspecto*, sworn declarations by several Inventors and the persons who assisted them, and a sworn declaration by an expert.

These documents include a declaration on honour by Prof. Cani (**Exhibit C.23**) drawn up for the purposes of the interference proceedings before the USPTO (the proceedings pending in the USA referred to in the above point). **11 above**). This affidavit traces the chronology of the work and results obtained by the Inventors. The declaration is dated 1ˢᵗ October 2020 but refers to documents of the time (**exhibits C.1 to C.22**). It is corroborated by several other affidavits, including those of Prof. De Vos and an expert, Mr Colin Hill (**exhibits C.23 to C.27**).

Below, the work of the Inventors and their results are discussed in detail:

- **From 10 December 2010**: in line with the joint research project of Professors Cani and de Vos and their teams, an experimental protocol is proposed to administer *Akkermansia muciniphila* to two groups of mice (obese mice vs. non-obese mice) and to analyse the impact on both groups (**exhibits C. 2 and C. 3**). The protocol is discussed and adapted (**exhibits C.4 to C.11**). The bacteria will be provided by Prof. de Vos and Dr. Belzer with the help of the PhD student Janneke Ouwerkerk and the experiments and analyses will be conducted by Prof. Cani and Everard with the help of the PhD student Lucie Geurts.

- **From December 2011 to February 2012**: mice are prepared for the experiment. The *Akkermansia muciniphila* bacterium is administered to mice 3 times a week by oral gavage from 12 December 2011. The researchers are interested in measuring and analysing various metabolic parameters and the evolution of the mice over a period of eight weeks, in order to determine the therapeutic effects of the oral administration of the *Akkermansia muciniphila* bacteria on the subjects.

---

*wherein altering the microbiota comprises increasing relative abundance of Verrucomicrobiales in the gastrointestinal tract of the subject by at least 5%;*
*wherein the metabolic disorder is selected from the group consisting of: obesity, metabolic syndrome, insulin deficiency, Diabetes Mellitus, glucose intolerance, diabetes, non-alcoholic fatty liver disease, dyslipidemia, and hypercholesterolemia "*

Four groups of mice were examined. The first two groups were normal weight mice that received either phosphate buffered saline (group 1) or a preparation of *Akkermansia muciniphila* bacteria (group 2). The third and fourth groups consisted of mice fed a particularly high-fat diet, with group 3 receiving phosphate-buffered saline and group 4 receiving a preparation of *Akkermansia muciniphila*.

## The documents related to the study are included in Exhibits C.12 to C.15 (study schedule, study protocol and laboratory notebook).

Already after two weeks (22 December 2011), it was found that in the group of mice fed a high-fat diet, those that had received a preparation with *Akkermansia muciniphila* bacteria (group 4) showed a reduced fat mass compared to the other group (group 3), **indicating a positive therapeutic effect (exhibit C.16).**

On 5 January 2012, Prof. Cani informs his Dutch colleagues that *"the trends in body weight gain and fat mass (measured by NMR) are very encouraging (lower gain with Ak. M.), hoping that the next 4 weeks will confirm the results and become statistically significant"*[12] **(Exhibit C.17, p. 1).**

Observations at the end of the study confirmed this trend and also showed that the animals in group 4 had **significantly less body fat than the animals in group 3.** The mice were then autopsied to confirm and extend the results.

The final analysis data is shown in **Exhibits C.18 and C.19**

This data was analysed and structured by the Inventors before 29 February 2012 and therefore before the Keystone Symposium, which started on 4 March 2012.

- **Early March 2012:** In preparation for their presentation at Keystone on 6 March 2012, Prof. Cani and Prof. Everard prepared a poster in which they summarised their experiment and its results. This poster is a key piece as it was disclosed to Alice Liou, allowing her to take the research results away from the Inventors. It is reproduced below.

The accuracy of the above facts is attested to by the sworn declarations contained in exhibits **C.23 to C.26**

---

[12] Free translation of : *"the trends in body weight gain and fat mass (measured by NMR) are very encouraging (lower gain with Ak. M.), hoping that the next 4 weeks will confirm the results and becoming statistically significant".*

# Akkermansia muciniphila links gut barrier function with inflammation and metabolic disorders associated with obesity.

Amandine Everard[1], Laure B. Bindels, Nathalie M. Delzenne[1], Patrice D. Cani[1]  Contact.
1 Université catholique de Louvain, Louvain Drug Research Institute, Metabolism and Nutrition research group, Brussels, Belgium.

## Background

Obesity and associated metabolic disorders are associated with low-grade inflammation. Prebiotic-induced changes in gut microbiota improve gut permeability inflammation and metabolic disorders. We found that prebiotic treatment dramatically increases Akkermansia muciniphila in genetic obese mice.



## Aims of the study



1° to investigate the effects of high-fat diet-induced obesity and type 2 diabetes on Akkermansia muciniphila

2° To evaluate the impact of prebiotic on the abundance of Akkermansia muciniphila in this model of obesity

3° To unravel its implication on gut barrier functions, inflammation and metabolism

## Experimental procedures

✓C57BL/6J mice treated with prebiotics (oligofructose) for 8 weeks and fed a control or high fat diet

- Akkermansia muciniphila quantification by q-PCR
- Inflammation markers analysis in the gut, liver and subcutaneous adipose tissue

✓C57BL/6J mice treated with Akkermansia muciniphila for 8 weeks and fed a control or high fat diet

**1) Gut microbiota modulations decrease body weight and fat mass in high-fat diet-induced obesity model**



**2) Akkermansia muciniphila is decreased upon high-fat diet and increased with prebiotic treatment**



**3) Akkermansia muciniphila inversely correlates with whole body inflammation**



**4) Akkermansia muciniphila decreases body weight and fat mass in a high-fat diet-induced obesity model**



## Conclusion and Perspectives

In conclusion, we propose Akkermansia muciniphila as a novel bacteria causally linked with whole body inflammation and metabolism in obesity. We are currently investigating the impact of Akkermansia muciniphila administration in several obesity and type 2 diabetes models.



26.    From the above summary and the poster, the following can be highlighted:

-    The Inventors **started with the observation** that :

    o    obesity and associated metabolic disorders were associated with low-grade inflammation in obese subjects;

    o    this inflammation and associated disorders could be treated by changes in the gut microbiota[13] brought about by the administration of prebiotics[14] ;

    o    administration of prebiotics significantly increases the population of the bacterium *Akkermansia muciniphila* in obese mice.

-    The **objectives of the study** conducted by the Inventors were:

---

[13] The microbiota is the set of micro-organisms - bacteria, micro-fungi, protists - living in a specific environment such as a mammal.

[14] Prebiotics are a kind of 'food' for gut bacteria. The bacteria do not need them to live, but they promote the growth of the bacteria and allow them to perform their beneficial functions on the health of the host more efficiently.

- o  to evaluate the effects of *Akkermansia muciniphila* bacteria on high-fat diet-induced obesity and type 2 diabetes;

- o  to evaluate the impact of prebiotics on the abundance of the bacterium *Akkermansia muciniphila* in the above-mentioned obesity model;

- o  to discover the implications for gut barrier function, inflammation and metabolism.

- The results of the study are that :

- o  modulation of the gut microbiota decreases body weight and fat mass in the high-fat diet-induced obesity model;

- o  the population of the bacterium *Akkermansia muciniphila* is decreased by a high-fat diet and increased by prebiotic treatment;

- o  the population of *Akkermansia muciniphila* bacteria is inversely correlated with body inflammation;

- o  The bacterium *Akkermansia muciniphila* reduces body weight and fat mass in the high-fat diet-induced obesity model.

- In conclusion, the Inventors propose *Akkermansia muciniphila* as a novel bacterium causally linked with body inflammation and metabolism in obesity. They report several other ongoing studies to evaluate the administration of *Akkermansia muciniphila* in several models of obesity and type II diabetes.

(iii)  **Comparison between the invention and the work of the Inventors**

27.    All of the items listed in point 26 were disclosed in confidence to Alice P. Liou, who obviously disclosed them to the inventors listed in the Contested Application. They therefore had access to this work and these results **before the filing of the Contentious Application and before the amendment of the American Application.**

The table below sets out side by side the features of the invention as described in point 24 and the work of the Inventors as set out in 26.

| Invention of the Litigation Claim | Work of the Inventors |
|---|---|
| A pharmaceutical dosage form which comprises a therapeutically effective amount of a sample comprising Akkermansia, the sample comprising at least 50% Akkermansia together with a pharmaceutically acceptable carrier (Feature 1) | The Inventors' work is based on the oral administration of a therapeutically effective amount of the bacterium *Akkermansia muciniphila* in mice. |
| For the treatment of any of the following metabolic disorders: obesity, metabolic syndrome, insulin deficiency, diabetes mellitus [i.e. type II diabetes], impaired glucose tolerance, diabetes, non-alcoholic fatty liver disease, dyslipidaemia and hypercholesterolaemia (feature 2) | The bacterium *Akkermansia muciniphila* reduces body weight and fat mass in the high-fat diet-induced obesity model. The Inventors propose the bacterium *Akkermansia muciniphila* as a new bacterium causally linked with body inflammation and metabolism in obesity. The Inventors report ongoing studies to evaluate the administration of *Akkermansia muciniphila* bacteria in several models of obesity and type II diabetes. |
| The treatment includes the form altering a microbiota in the subject by increasing the relative | The Inventors' work is based on a modification of the microbiota in the subject in which the |

| | |
|---|---|
| abundance of Verrucomicrobiales in the subject's gastrointestinal tract by at least 5% (feature 3) | population of the bacterium *Akkermansia muciniphila* (belonging to the order Verrucomicrobiales, see point 29 below) is increased. |

28.    From this table it can be seen that the invention claimed in the Contested Application takes up the fundamental teachings of the Inventors' work. This borrowing relates to the essential aspects of the said invention.

(iv)    **The parties cited have unlawfully taken away the invention made by the Inventors**

29.    The Litigation Application filed on 28 February 2013 claims priority from the US Application, filed on 29 February 2012, shortly before the Keystone Symposium. Dr. A. Liou is not mentioned as a co-inventor in this first priority document.

The U.S. Application was amended to incorporate the Inventors' invention without authorization and therefore illegally.

**The U.S. Application as originally filed** - The *Akkermansia* bacterium is mentioned in only two places in the U.S. Application as originally filed. The first mention is in a section of the application (corresponding to paragraphs [0049] to [0058]). This section of the application, entitled "Microbiota", contains explanations of what the application means by "microbiota" modified by the compositions and processes according to the invention. To understand these explanations, it is useful, as a preliminary matter, to reproduce the systematic classification of the *Akkermansia* bacteria:

| Classification | |
|---|---|
| Règne | *Bacteria* |
| Sous-règne | *Negibacteria* |
| Embranchement | *Verrucomicrobia* |
| Classe | *Verrucomicrobiae* |
| Ordre | *Verrucomicrobiales* |
| Famille | *Akkermansiaceae* |
| Genre | *Akkermansia* |
| **Espèce** | |
| ***Akkermansia muciniphila*** | |
| Derrien & et al., 2004[1] | |

*Akkermansia* is therefore a genus of bacteria that belongs to the upstream sets of classifications (kingdom, class, order etc.) and itself includes the downstream species *Akkermansia muciniphila*.

Returning to the explanation given in the US Application, the microbiota is thus, according to the US Application, made up of one or more bacterial communities that can be found in the gastrointestinal tract of an organism. The microbiota may be identical or different. In particular, they may come from the phyla *Bacteroidetes, Firmicutes, Proteobacteria, Tenericutes* or *Verrucomicrobia*. The *Verrucomicrobia* phylum is, according to the US

Application (paragraph [0052]), a newly described divergent phylum of which only rudimentary knowledge is available. In an exemplary embodiment given at the end of paragraph [0052], it is stated that the composition may alter the relative abundance of bacteria of the class *Verrucomicrobiae*, order *Verrucomicrobiales*, family *Verrucomicrobiaceae* and/or genus *Akkermansia*. However, this passage does not attribute any particular effect to such a change in the relative abundance of this bacterium.

The second reference to *Akkermansia* bacteria is in paragraph [0079] in the section "Microbiota compositions and combined preparations". The application states that the compositions provided may, for example in a pharmaceutical composition, directly or indirectly alter the relative abundance of microbiota to a predetermined level and duration (see [0074] and [0075]). Paragraph [0076] states that the composition may contain mixtures of bacterial strains and include viable (live), dormant, inactivated or dead microbiota, or any combination thereof. According to paragraph [0077], the composition may consist of a combination of bacteria from different phyla, such as *Bacteroidetes, Firmicutes, Proteobacteria, Tenericutes and Verrucomicrobi*, which may lead to synergistic effects in some applications, as well as a combination of bacteria from different phyla, classes, orders and families, for which paragraph [0078] then generally and vaguely proposes a series of combinations as preferred embodiments. As a further embodiment, paragraph [0079] mentions as an example a composition of bacteria from the class *Verrucomicrobiae*, the order *Verrucomicrobiales*, the family *Verrucomicrobiaceae* and/or the genus *Akkermansia*, which, as a further possible embodiment, may additionally contain bacteria from at least one or more of the groups *Bacteroidetes, Firmicutes* and *Proteobacteria*.

The U.S. Application as originally filed contains no further reference or information on *Akkermansia* bacteria. It contains no indication, *a fortiori* supported by comparative trials, as to whether altering the relative abundance of *Akkermansia* bacteria in the intestinal tract has any effect, and if so, what that effect is. Nor does it contain specific data on the modification of the relative abundance of *Akkermansia* bacteria in the digestive tract by the administration of a pharmaceutical composition, possibly composed exclusively of *Akkermansia* bacteria.

Nowhere is it stated that a composition specifically composed of *Akkermansia* bacteria would be suitable for solving the problem of providing a suitable composition for the treatment of metabolic disorders, of which obesity and diabetes are a part.

It is clear that at the time of filing the application (29 February 2012), the specific influence of *Akkermansia* bacteria on human health was not known, nor was it known that a preparation specifically containing *Akkermansia* bacteria could be used to treat obesity and diabetes.

This is well illustrated by paragraph [0081] of the application which states that the methods and compositions according to the invention comprise the treatment of weight-related disorders such as obesity by substantially altering the relative abundance of the microbiota and to this end mentions, inter alia, *Verrucomicrobia* (phylum) or *Verrucomicrobiales* (order), but does not specifically address the genus *Akkermansia*.

It is also significant that the original document does not include any patent claims claiming a pharmaceutical composition containing the *Akkermansia* bacterium or the administration of a composition containing *Akkermansia as* part of a process.

The above analysis is confirmed by the affidavit of the expert Colin Hill (**Exhibit C.27**, see in particular paragraphs 28 to 31)

**Conclusion** - On 29 February 2012, the inventors of the Contested Claim were not aware of the work carried out and the results obtained by the Inventors and therefore had no knowledge of the specific properties of the *Akkermansia* bacterium.

30.   **After the Keystone symposium - amendment of the U.S. Application and filing of the international patent application PCT/US2013/028271 leading to the Litigation Application.** After the Keystone presentation by Prof. Cani and Prof. Everard, many changes were made to the US Application. **Exhibit B.3** is a comparative version highlighting the changes made on 29 August 2013 to the US Application. The International Patent Application PCT/US2013/028271, filed by the first two parties cited after the Keystone Symposium, directly incorporated the Inventors' teaching.

While originally the reference to the family Verrucomicrobiaceae as well as the class Verrucomicrobiae was secondary and the genus Akkermansia was only mentioned twice, in secondary paragraphs, **the amended US Application mentions *Akkermansia* 48 times (!)**[15] . The subject matter of the invention (§ [0007]) has been expressly extended to the genus *Akkermansia* :

> "*[0007] The present invention generally provides methods and compositions for treating weight-related conditions and disorders by modifying the microbiota in a subject. One aspect provides methods and compositions for modifying the microbiota in a subject by administering to the subject a composition containing substantially purified microbiota from phyla such as [...] Verrucomicrobia or orders such as [...] Verrucomicrobiales, or genera such as [...] Akkermansia. Another aspect provides a pharmaceutical composition for modifying microbiota, which contains a therapeutically effective amount of substantially purified microbiota from phyla such as [...] Verrucomicrobia or orders such as [...] Verrucomicrobiales or genera such as [...] Akkermansia, and a pharmaceutically acceptable carrier. Methods of treating a disorder or condition associated with weight gain, or methods of losing weight in a subject in need of such treatment, by substantially increasing the relative abundance of the microbiota of phyla such as [...] Verrucomicrobia or orders such as [.... ] Verrucomicrobiales or genera such as [...] Akkermansia in a gastrointestinal tract of the subject without or in addition to a surgical procedure are also disclosed.*"

In the Litigation Application filed on 28 February 2013, *Akkermansia* is cited 55 times (!), including three times in the claims (claims No. 16, 21 and 35).

In its latest version of 28 June 2022, the Litigation Application is, for its part, entirely dedicated to the *Akkermansia* bacterium since, according to claim 1 reproduced in point 23 The presence of "*a therapeutically effective amount of a sample comprising Akkermansia, the sample comprising at least 50% Akkermansia*" is one of the main features of the invention. These are found in all the claims.

The chronology of the amendments can only lead to one conclusion: Before the presentation of Prof. Cani and Prof. Everard to Keystone and the subsequent discussion between Dr. Alice P. Liou and Prof. Cani, the inventors

---

[15] See in particular in the following paragraphs: [0008], [0010], [0013], [0066], [0067], [0069], [0089], [0090], [0092], [0095], [0099], [0100], [0101], [0103], [0107], [0110], [0112], [0113], [0114], [0118], [0122], [0166], [0168], [0178].

of the Litigation Application were not aware of the work carried out and the results obtained by the Inventors. Liou and Prof. Cani, the inventors of the Contested Application were not aware of the work carried out and the results obtained by the Inventors. Thanks to this presentation, they became aware of it. By including it in the U.S. Application and in the Litigation Application, the inventors of the Litigation Application have removed the invention made by the Inventors (in violation of the confidentiality obligation imposed by the format of the Keystone presentation mentioned in point 10).

In his affidavit, expert Colin Hill also concludes that only the Inventors have found that oral administration of a substantially purified strain of Akkermansia bacteria reduces body weight gain and fat mass development in mice compared to reference mice, thus contributing to the treatment of obesity and diabetes, i.e. metabolic disorders (see exhibit C. 27, point 39 *in fine*).

**(v)      Conclusion**

31.     From the foregoing, it appears that the named parties have unlawfully subtracted and claimed in the Contested Application an invention made by the Inventors. The Inventors should therefore be listed as co-inventors of EP 2,836,224 in place of Lee M. Kaplan, Alice P. Liou, Peter J. Turnbaugh and J.D. L. Liou, Peter J. Turnbaugh and Jason L. Harris. In addition, the Universities, as successors in title to the Inventors, should be considered the sole rightful owners of the Litigation Application, to the exclusion of the named parties.

**CLAIM MADE TO THE COURT (purpose of the claim)**

-   To declare that Mr. Patrice Cani, Ms. Amandine Everard, Ms. Clara Belzer and Mr. Willem De Vos are the true inventors of the invention claimed in the European patent application EP 2 836 224;

-   Therefore, order that Mr. Patrice Cani, Ms. Amandine Everard, Ms. Clara Belzer and Mr. Willem De Vos be listed as inventors, in place of Lee M. Kaplan, Alice P. Liou, Peter J. Turnbaugh and Jason L. Harris, on the European patent application EP 2 836 224, on any divisional patent application based on the European patent application EP 2 836 224, and on any divisional patent application based on the European patent application EP 2 836 224. Liou, Peter J. Turnbaugh and Jason L. Harris on the European patent application EP 2 836 224, on any divisional European patent application based on the European patent application EP 2 836 224, and on any patent to which these applications will give rise, if any;

-   To declare that in their capacity as successors in title of Mr Patrice Cani and Mrs Amandine Everard for the former, and of Mrs Clara Belzer and Mr Willem De Vos for the latter, the right to obtain the European patent resulting from the European patent application EP 2 836 224 belongs for half to the University of Wageningen and for half to the Catholic University of Leuven;

-   Consequently, order that Wageningen University and the Catholic University of Leuven be mentioned instead of the named parties as co-owners in the patent application EP 2 836 224 and, subsequently, in the patent as it may be granted;

-   Declare that, as co-owners of the right to obtain the European patent arising from European patent application EP 2 836 224, Wageningen University and the Catholic University of Leuven are also vested with a co-ownership right, each for half, in any divisional European patent application based on European patent application EP 2 836 224;

- Order the parties to pay the costs of the proceedings, including procedural damages of EUR 14 000.

Subject to the reservation of all and any rights and without any prejudicial admissions and, in particular, expressly subject to increasing or decreasing the amount of the main claim during the proceedings.

Claim based on the preceding grounds, the laws and regulations in this regard, and on any other means, in fact and in law, to be enforced in due course;

> CLOSING FORMULA, BREAKDOWN OF THE COST OF THE WRIT
> & PROCESS SERVER'S SIGNATURE

And so that the addressee(s) is (are) aware of it, I left them, being there and speaking as specified above, a copy (copies) of this writ, in (a) separate sealed envelope(s) if necessary, in accordance with the law. Delivered with a translation in English.

In witness whereof this writ. Costs: two thousand five hundred ~~fifty~~ two euros and eight cents

Sgn The Process Server.
Certified true translation

Breakdown of the cost of this writ according to the tariff set by the Royal Decree of 30 November 1976:

| Costs EDKD SRL | | |
|---|---|---|
| Fees | | |
| Fees (art.6) | 143,97 | (*) |
| Additional copy fees (art.6) | 316,69 | (*) |
| Service fee (art.16§6) | 12,98 | (*) |
| Verification of the address (art.13/1°b) | 24,24 | (*) |
| Travel expenses (art.15/4°) | 10,15 | (*) |
| Certified true copies (art.15/1°-2) | 1.043,28 | (*) |
| Translation costs (art. 16/5°) | 29,98 | (*) |
| Expenses | | |
| Plea stamp (lawyer)(art.16/5°) | 3,70 | |
| Search enquiry costs (art.16/5°) | 1,14 | (*) |
| Pstage & Dispatch (art.16/5°) | 80,00 | (*) |
| Costs United States of America | 381,16 | (*) |
| Budgetary fund for secondary legal assistance | 24,00 | |
| Registre central des actes authentiques dématérialisés | 1,35 | (*) |
| Taxes | | |
| Registration tax (art.16/5°) | 50,00 | |
| Total of costs, VAT excl. | 2.122,64 | |
| Total of costs, VAT | 429,44 | 21% sur 2.010,06 euro (*) |
| Total of costs, VAT incl. | 2.552,08 | |

The articles ( ) refer to the Royal Decree of 30 November 1976 on the civil and commercial rate of judicial officers' writs.

> Registration fees – Application of Section 8bis of the Belgian Registration, Mortgage
> and Court Registry Fees Code – Registration fee: EUR 50.00

*Statement on the Protection of Personal Data (GDPR):*
*The process server and their personnel will process your personal data only for purposes relating to the legal instruction given to the process server, who holds a mandate in the public interest and falls under the scope of public order (Article 6, I, e). In this respect, your consent is not required because processing your data is essential for performing the instructions envisaged by law. The process server and their personnel will do their utmost to protect your personal data, which will not be shared with third parties under any circumstances, except for the case envisaged by law (including another process server, a public prosecutor, magistrate, registrar, attorney, the Public Social Welfare Centre (CPAS) or central base of attachment notices, as the case may be). Your data will be kept securely on the servers of the process server, who does not use a cloud server; access to this server is secured by an individual password. The process server and their personnel process no data that fall under special categories, as specified in Article 9 of the General Data Protection Regulation (GDPR). The Controller for the processing is Quentin Debray, process server practicing at Val des Seigneurs 15, 1150 Woluwe-Saint-Pierre. The Data Protection Officer (DPO) can be contacted at privacy@debray.be. You have the rights as set out in Article 15-18 of the GDPR. The data will be retained for 10 years after the end of the process server's instruction, being the maximum retention period for statutory, tax and accounting obligations, and for civil liability.*



Secretary of the Commonwealth of Massachusetts

HOME | DIRECTIONS | CONTACT US

## Corporations Division

### Business Entity Summary

ID Number: 666001229

[Request certificate]   [New search]

Summary for: **PRESIDENT AND FELLOWS OF HARVARD COLLEGE**

| The exact name of the School: PRESIDENT AND FELLOWS OF HARVARD COLLEGE |
| --- |
| Merged with RADCLIFFE COLLEGE on 10-01-1999 |
| Entity type: School |

| Identification Number: 666001229 | Old ID Number: |
| --- | --- |
| Date of Organization in Massachusetts: 05-30-1650 | |
| | Last date certain: |
| Current Fiscal Month/Day: 6 /30 | Previous Fiscal Month/Day: 1 /00 |

The location of the Principal Office in Massachusetts:

Address:   HARVARD UNIVERSITY MASSACHUSETTS HALL

City or town, State, Zip code, Country:     CAMBRIDGE,  MA  02138  USA

The name and address of the Resident Agent:

Name:

Address:

City or town, State, Zip code, Country:

The Officers and Directors of the Corporation:

| Title | Individual Name | Address | Term expires |
| --- | --- | --- | --- |
| | | | |

☐ Consent     ☐ Confidential Data     ☐ Merger Allowed     ☐ Manufacturing

View filings for this business entity:

| ALL FILINGS |
| --- |
| Annual Report |
| Application For Revival |
| Articles of Amendment |
| Articles of Consolidation - Foreign and Domestic |

The Open Database Of The Corporate World          ⊙ Companies   ○ Officers   ☑ only in Massachusetts (US)          Log in/Sign up

# PRESIDENT AND FELLOWS OF HARVARD COLLEGE

| | |
|---|---|
| Company Number | 656001229 |
| Status | Active |
| Incorporation Date | 30 May 2016 (over 6 years ago) |
| Company Type | School |
| Jurisdiction | Massachusetts (US) |
| Registered Address | HARVARD UNIVERSITY, MASSACHUSETTS HALL |
| | CAMBRIDGE |
| | 02138 |
| | MA |
| | USA |
| Registry Page | https://corp.sec.state.ma.us/CorpWeb/... |

## Recent filings for PRESIDENT AND FELLOWS OF HARVARD COLLEGE

6 Dec 2010   ARTICLES OF AMENDMENT

1 Oct 1999   ARTICLES OF MERGER - DOMESTIC AND DOMESTIC

Miscellaneous Amendment - Merger SURVIVOR IN A CHAPTER 180 SECTION 10
MERGER WITH RADCLIFFE COLLEGE, A NON- PROFIT CORPORATION

*Source Massachusetts Secretary of the Commonwealth, Corporations Division,
https://corp.sec.state.ma.us/CorpWeb/... 17 Oct 2022*

ADD DATA (WEBSITE, ADDRESS, ETC)

## Company Addresses

11 Company Addresses, showing 10 most recently added
COMPANY ADDRESS
17 Quincy Street, Cambridge, MA 02138, US

## Latest Events

- 1900-01-01        Incorporated

- 2019-07-12 -      Change of status from '' to 'Active'
  2021-04-19

- 2019-07-12 -      No longer inactive
  2021-04-19

See all events

## Corporate Grouping   USER CONTRIBUTED

None known. Add one now?
See all corporate groupings

## Similarly named companies

Found 17. Showing first 10

THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE
*(Pennsylvania (US), 12 Dec 1935- )*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE
INCORPORATED   *(Connecticut (US), 6 Jul 2022- )*

branch inactive PRESIDENT AND FELLOWS OF HARVARD
COLLEGE INCORPORATED   *(Vermont (US), 22 Jul 2022- )*

branch )PRESIDENT AND FELLOWS OF HARVARD
COLLEGE, INC. A/K/A PRESIDENT AND FELLOWS OF
HARVARD COLLEGE   *(Maryland (US), 11 Aug 2022- )*

branch inactive PRESIDENT AND FELLOWS OF HARVARD
COLLEGE   *(California (US), 26 Feb 2001- )*

HARVARD UNIVERSITY PRESS LIMITED   *(United Kingdom, 15
Jul 1974- )*

branch inactive PRESIDENT AND FELLOWS OF HARVARD
COLLEGE   *(New York (US), 6 Jul 2022- )*

branch inactive PRESIDENT AND FELLOWS OF HARVARD
COLLEGE   *(Maine (US), 31 May 1650- )*

branch inactive President and Fellows of Harvard

# opencorporates

The Open Database Of The Corporate World

Company name or number    **SEARCH**

○ Companies  ○ Officers  ☑ only in Massachusetts (US)

Log in/Sign up

## THE GENERAL HOSPITAL CORPORATION

**Company Number** 042657583
**Previous Company Numbers** 000100047
**Status** Active
**Incorporation Date** 12 June 1579 (over 43 years ago)
**Company Type** hospital
**Jurisdiction** Massachusetts (US)
**Registered Address** 55 FRUIT STREET
BOSTON
02114
MA
USA

**Directors / Officers** ADELENE Q. PERKINS, trustee
CARL J. MARTIGNETTI, trustee
DAVID F.M. BROWN, M.D., F. president
DAVID F.M. BROWN, M.D., F. trustee
DAVID H. LONG, trustee
DIANE B. PATRICK, ESQ, trustee
JAMES F. MOONEY, III, trustee
JOHN R. INGRAM, ESQ, secretary
JONATHAN A. KRAFT, director

**SEE ALL**

**Registry Page** https://corp.sec.state.ma.us/CorpWeb/...

### Recent filings for THE GENERAL HOSPITAL CORPORATION

6 Apr 2022   CERTIFICATE OF CHANGE OF DIRECTORS OR OFFICERS
21 Oct 2020  ARTICLES OF MERGER - DOMESTIC AND DOMESTIC
14 Sep 2010  ARTICLES OF MERGER - DOMESTIC AND DOMESTIC
24 Jun 1992  RESTATED ARTICLES OF ORGANIZATION
             SOC Corp Transaction Code: 045 Amendment (Non-Profit) - Change of Purpose
             Amendment (Non-Profit) - Membership  Amendment (Non-Profit) - Other Law
22 Nov 1983  ARTICLES OF AMENDMENT
             Amendment (Non-Profit) - Change of Purpose
6 Dec 1979   ARTICLES OF ORGANIZATION
             SOC Corp Transaction Code: 011

**Source** Massachusetts Secretary of the Commonwealth, Corporations Division,
https://corp.sec.state.ma.us/CorpWeb/... , 17 Oct 2022

**ADD DATA (WEBSITE, ADDRESS, ETC)**

## Company Addresses

**HEAD OFFICE ADDRESS**
55 FRUIT STREET, BOSTON, MA 02114, USA

## Branches ●

THE GENERAL HOSPITAL CORPORATION (South Dakota (US); 11 Mar 2020- )       details
THE GENERAL HOSPITAL CORPORATION (Oregon (US); 7 Feb 2017- )              details
THE GENERAL HOSPITAL CORPORATION (Hawaii (US), 28 Dec 2015- )            details
GENERAL HOSPITAL CORPORATION (THE) (Idaho (US); 21 Oct 2014-15 Jan 2019) details
THE GENERAL HOSPITAL CORPORATION (West Virginia (US); 14 May 2014-20 Jul 2020) details

See all (40 records)

## Trademark registrations ●

| MARK TEXT | IMAGE | REGISTER | NICE CLASSIFICATIONS | REGISTRATION DATE | EXPIRY DATE | |
|---|---|---|---|---|---|---|
| THE KRAFT CENTER FOR COMMUNITY HEALTH | | United States Patent and Trademark Office | 41, 44 | 2020-06-23 | | details |
| COMMUNITY CARE IN REACH | | United States Patent and Trademark Office | 44 | 2020-02-11 | | details |
| FIRST RESPONDER NO SHAVE | | United States Patent and Trademark Office | 36 | 2019-09-17 | | details |
| NEUROBANK | NEUROBANK | United States Patent and Trademark Office | 42 | 2019-07-16 | | details |
| MASS GENERAL | MASS GENERAL | United States Patent and Trademark Office | 44 | 2018-07-10 | | details |

See 26 (57 records)

### Latest Events

- 1979-12-06 - 2016-09-27    Addition of officer SEE DOCUMENT FOR ADDITIONAL NAMES, trustee
- 2019-04-29 - 2021-04-19    Addition of officer NONE NONE, director
- 2019-04-29 - 2021-04-19    Change of status from " to 'Active'

See all events

### Corporate Grouping (USER CONTRIBUTED)
None known. ADD ONE NOW?
See all corporate groupings

### Similarly named companies
Found 129. Showing total 10

CIBOLA GENERAL HOSPITAL CORPORATION (New Mexico (US); 11 Mar 1950- )
Atlantic General Hospital Corporation (Virginia (US); 16 Nov 2000- )
ATLANTIC GENERAL HOSPITAL CORPORATION (Maryland (US); 13 Apr 1909- )
Carteret County General Hospital Corporation (North Carolina (US); 22 Sep 1970- )
GENERAL HOSPITAL CORPORATION THE (Vermont (US); 15 Aug 2000- )
The General Hospital Corporation (Pennsylvania (US); 16 Nov 2010- )
THE GENERAL HOSPITAL CORPORATION (New Jersey (US); 22 Mar 2011- )
THE GENERAL HOSPITAL CORPORATION (Nevada (US); 16 Sep 2010- )
THE GENERAL HOSPITAL CORPORATION (Maryland (US); 14 Apr 2010- )
ATLANTIC GENERAL HOSPITAL CORPORATION (Delaware (US); 4 Dec 2009- )

* While we strive to keep this information correct and up to date, it is not the primary source, and the company registry (the source, above) should always be referred to for definitive information.

Date on this page last changed October 19 2022

**OPEN DATA**
For access please Log in / Sign up

⚠ **Problem/question about this data?** Click here

| About us | Using our data | Help | Contact | Impact |
|---|---|---|---|---|
| About | Our data | API Reference | Twitter | Impact |
| Blog | Our purpose | Glossary | Medium | Grants |
| Team | Legal/Licence | Status | Newsletter | |
| Governance | User/Cookie privacy policy | | Problems with our data? | |
| Jobs | Public records privacy policy | | Temporary redaction | |



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts

HOME    DIRECTIONS    CONTACT US

## Corporations Division

### Business Entity Summary

ID Number: 042697983

Request certificate    New search

Summary for: THE GENERAL HOSPITAL CORPORATION

| The exact name of the Hospital: | THE GENERAL HOSPITAL CORPORATION |
|---|---|

Merged with MASSACHUSETTS BIOMEDICAL RESEARCH CORPORATION on 09-30-2010
Merged with MGH HEALTH SERVICES CORPORATION, THE on 10-31-2020

Entity type:  Hospital

| Identification Number: 042697983 | Old ID Number: 000100047 |
|---|---|

Date of Organization in Massachusetts:  12-06-1979

|  | Last date certain: |
|---|---|
| Current Fiscal Month/Day: 09/30 | Previous Fiscal Month/Day: 09/30 |

The location of the Principal Office in Massachusetts:

Address:   55 FRUIT STREET

City or town, State, Zip code, Country:      BOSTON,  MA  02114  USA

The name and address of the Resident Agent:

Name:

Address:

City or town, State, Zip code, Country:

The Officers and Directors of the Corporation:

| Title | Individual Name | Address | Term expires |
|---|---|---|---|
| PRESIDENT | DAVID F.M. BROWN, M.D., F. | 55 FRUIT ST. BOSTON, MA 02114 USA | Until a successor is duly qualified and elected. |
| TREASURER | NIYUM GANDHI | 55 FRUIT ST. BOSTON, MA 02114 USA | Until a successor is |

**Frank LaRose**
Ohio Secretary of State

# BUSINESS DETAILS & FILINGS

Close

## Business Details

| | | | |
|---|---|---|---|
| Entity #: | 1271827 | Business Name: | ETHICON ENDO-SURGERY, INC. |
| Filing Type: | CORPORATION FOR PROFIT | Status: | Active |
| Original Filing Date: | 11/19/2001 | Exp. Date: | - |
| Location: | CINCINNATI HAMILTON | | |

## AGENT/REGISTRANT INFORMATION

CT CORPORATION SYSTEM
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS OH 43219
04/17/2017
Active

Business ID Theft
Protect Yourself

Sign up to receive e-mail notifications of any changes or
updates made to this business entity.

# SEARCH BY BUSINESS NAME

General Information

Business Search ▾

Trademark/Service Mark Search ▾

Help

**Business Name:** ethicon

◉ All    ○ Active    ○ Cancelled    ○ Dead

SEARCH    CLEAR    Name Search Help

## SEARCH RESULTS

Showing 1 to 6 of 6 entries

| Entity# | Name | Type | Filing Date | Exp. Date | Status | Location | County | State | View Report |
|---------|------|------|-------------|-----------|--------|----------|--------|-------|-------------|
| 890448 | ETHICON ENDO-SURGERY, INC. | CORPORATION FOR PROFIT | 12/29/1994 | - | Dead | CINCINNATI | HAMILTON | OHIO | SHOW DETAILS |
| 273547 | ETHICON ENDO-SURGERY, INC. | CORPORATION FOR PROFIT | 08/22/1958 | - | Dead | SOLON | CUYAHOGA | OHIO | SHOW DETAILS |
| 1271827 | ETHICON ENDO-SURGERY, INC. | CORPORATION FOR PROFIT | 11/19/2001 | - | Active | CINCINNATI- | HAMILTON | - | SHOW DETAILS |
| 3929981 | ETHICON US, LLC | FOREIGN LIMITED LIABILITY COMPANY | 08/12/2016 | - | Active | - | - | TEXAS | SHOW DETAILS |
| 687971 | ETHICON, INC. | FOREIGN CORPORATION | 11/03/1986 | - | Dead | | Conversion | NEW JERSEY | SHOW DETAILS |
| 740215 | ETHICON, INC. | FOREIGN CORPORATION | 01/05/1989 | - | Active | - | - | NEW JERSEY | SHOW DETAILS |

First   Previous   1   Next   Last

Export Results CSV    Export Results PDF



Emmanuel DEBRAY
Quentin DEBRAY
*Huissiers de justice*
*Gerechtsdeurwaarders*

Barbara MEIRSSCHAUT
*Lic. rechten, LLM*

Joachim JANSSENS de VAREBEKE
*Master en droit*

*Candidats Huissier de Justice*
*Kandidaten Gerechtsdeurwaarders*

**HUISSIERS DE JUSTICE**
**GERECHTSDEURWAARDERS**

Val des Seigneurs 15 Herendal
Bruxelles 1150 Brussel

**EDKD Srl/Bv**
Bca/Kbo : 0479.100.321
*Etude ouverte / Kantoor geopend*
8.00 - 12.00 & 13.30 - 16.30
Tel : 02/772.81.92
Fax : 02/772.92.72

*etude@debray.be / kantoor@debray.be*

Comptes tiers/Derdenrekeningen:
BE64 1919 5165 6252 BIC CREGBEBB
BE23-0000-2847-6691 BPOTBEB1

 

197928_10252_1745218

Referte/Référence : 197928 / JD

- 201 –

RECEPISSE DE DEPOT D'UN ENVOI RECOMMANDE

**Non distribution :**
Indiquez vos noms et adresse sur l'envoi pour éviter la transmission aux rebuts en cas de non distribution

**Réclamation :**
La production du présent récépissé est obligatoire en cas de réclamation, demande d'avis de réception, etc.

**Perte :**
L'indemnité accordée en cas de perte d'un envoi recommandé est forfaitaire et répond uniquement à l'intérêt que l'expéditeur attache à la remise de son envoi.

Destinataire:     **ETHICON ENDO-SURGERY**

          **4545 Creek Road**

          **US-BLUE ASH, OH 45242\ UNITED STATES OF AMERICA**

| | I Taxe : |
|---|---|
| Numéro   : | I |
| Nature   : LETTRE | I          EUR |

| | I Remboursement |
|---|---|
| | I          EUR........................................... |
| | I |
| | I Signature de l'employé(e), |
| | I |

RF 094 806 946 BE



**DEBRAY & ASSOCIATES**

Emmanuel DEBRAY
Quentin DEBRAY
Huissiers de justice
Gerechtsdeurwaarders

Barbara MEIRSSCHAUT
Lic. rechten, LLM

Joachim JANSSENS de VAREBEKE
Master en droit

Candidats Huissier de Justice
Kandidaten Gerechtsdeurwaarder

HUISSIERS DE JUSTICE
GERECHTSDEURWAARDERS

Val des Seigneurs 15 Herendal
Bruxelles 1150 Brussel

EDKD Srl/Bv
Bce/Kbo : 0479.100.321
Etude ouverte / Kantoor geopend
8.00 - 12.00 & 13.30 - 16.30
Tel : 02/772.81.82
Fax : 02/772.92.72
etude@debray.be / kantoor@debray.be
Comptes tiers/Derdenrekeningen:
BE64 1919 5185 8252 BIC CREGBEBB
BE23-0000-2847-8691 BPOTBEB1



197928_10275_1745218

Referte/Référence : 197928 / JD
- 201 –

**RECEPISSE DE DEPOT D'UN ENVOI RECOMMANDE**

Non distribution :
Indiquez vos noms et adresse sur l'envoi pour éviter la transmission aux rebuts en cas de non distribution

Réclamation :
La production du présent récépissé est obligatoire en cas de réclamation, demande d'avis de réception, etc.

Perte :
L'indemnité accordée en cas de perte d'un envoi recommandé est forfaitaire et répond uniquement à l'intérêt que l'expéditeur attache à la remise de son envoi.

Destinataire:     **THE GENERAL HOSPITAL CORPORATION D/B/A M**

              **55 Fruit Street**

              **US-BOSTON, MA 02114 \ ETATS-UNIS D'AMERIQUE**

| | | I Taxe : |
|---|---|---|
| Numéro | : | I |
| Nature | : LETTRE | I        EUR |

I Remboursement
I
I        EUR..................................................
I
I Signature de l'employé(e),
I
I

2 8. 10. 2022

**R** RF 094 806 932 BE



Emmanuel DEBRAY
Quentin DEBRAY
Huissiers de justice
Gerechtsdeurwaarders

Barbara MEIRSSCHAUT
Lic. rechten, LL.M

Joachim JANSSENS de VAREBEKE
Master en droit

Candidats Huissier de Justice
Kandidaten Gerechtsdeurwaarder

**DEBRAY & ASSOCIATES**

HUISSIERS DE JUSTICE
GERECHTSDEURWAARDERS

Val des Seigneurs 15 Herendal
Bruxelles 1150 Brussel

EDKD Srl/Bv
Bce/Kbo : 0479.100.321
Etude ouverte / Kantoor geopend
8.00 - 12.00 & 13.30 - 16.30
Tel : 02/772.81.92
Fax : 02/772.92.72
etude@debray.be / kantoor@debray.be
Comptes tiers/Derdenrekeningen:
BE64 1919 5185 6252 BIC CREGREBB
BE23-0000-2847-8691 BPOTBEB1

197928_10275_1745218

Referte/Référence : 197928 / JD

- 201 –

RECEPISSE DE DEPOT D'UN ENVOI RECOMMANDE

Non distribution :
Indiquez vos noms et adresse sur l'envoi pour éviter la transmission aux rebuts en cas de non distribution

Réclamation :
La production du présent récépissé est obligatoire en cas de réclamation, demande d'avis de réception, etc.

Perte :
L'indemnité accordée en cas de perte d'un envoi recommandé est forfaitaire et répond uniquement à l'intérêt que l'expéditeur attache à la remise de son envoi.

Destinataire:  **PRESIDENT AND FELLOWS OF HARVARD COLLEGE**

17, Quincy Street

**US-CAMBRIDGE, MA 02138 \ ETATS-UNIS D'AMERIQUE**

| Taxe :
Numéro :
Nature : LETTRE              EUR

| Remboursement
        EUR.....................................

| Signature de l'employé(e),

2 8. 10. 2022

**R** RF 094 806 977 BE



Emmanuel DEBRAY
Quentin DEBRAY
*Huissiers de justice*
*Gerechtsdeurwaarders*

Barbara MEIRSSCHAUT
*Lic. rechten, LLM*

Joachim JANSSENS de VAREBEKE
*Master en droit*

*Candidate Huissier de Justice*
*Kandidaten Gerechtsdeurwaarder*

**DEBRAY & ASSOCIATES**

HUISSIERS DE JUSTICE
GERECHTSDEURWAARDERS

Val des Seigneurs 15 Herendal
Bruxelles 1150 Brussel

EDKD Srl/Bv
Bce/Kbo : 0476.100.321
*Etude ouverte / Kantoor geopend*
8.00 - 12.00 & 13.30 - 16.30
Tel : 02/772.81.82
Fax : 02/772.92.72

etude@debray.be / kantoor@debray.be

Comptes tiers/Derdenrekeningen:
BE64 1919 5165 6252 BIC CREGBEBB
BE23-0000-2847-8691 BPOTBEB1

 

---

Referte/Référence : 197928 / JD

- 201 –

## RECEPISSE DE DEPOT D'UN ENVOI RECOMMANDE

**Non distribution :**
Indiquez vos noms et adresse sur l'envoi pour éviter la transmission aux rebuts en cas de non distribution

**Réclamation :**
La production du présent récépissé est obligatoire en cas de réclamation, demande d'avis de réception, etc.

**Perte :**
L'indemnité accordée en cas de perte d'un envoi recommandé est forfaitaire et répond uniquement à l'intérêt que l'expéditeur attache à la remise de son envoi.

Destinataire:     **ETHICON ENDO-SURGERY**

**4400 Easton Cmns**
**US-COLUMBUS OH 43219/ UNITED STATES OF AMERICA,** 4545 Creek Road

| | | I Taxe : |
|---|---|---|
| Numéro | : | I |
| Nature | : LETTRE | I          EUR |

I Remboursement
I
I          EUR.................................................

Signature de l'employé(e).

2 8. 10. 2022

R RF 094 806 985 BE

Emmanuel DEBRAY
Quentin DEBRAY
Huissiers de justice
Gerechtsdeurwaarders

Barbara MEIRSSCHAUT
Lic. rechten, LL.M

Joachim JANSSENS de VAREBEKE
Master en droit

Candidats Huissier de Justice
Kandidaten Gerechtsdeurwaarder



**DEBRAY & ASSOCIATES**

HUISSIERS DE JUSTICE
GERECHTSDEURWAARDERS

Val des Seigneurs 15 Herendal
Bruxelles 1150 Brussel

EDKD Srl/Bv
Bce/Kbo : 0479.100.321
Etude ouverte / Kantoor geopend
8.00 - 12.00 & 13.30 - 16.30

Tel : 02/772.81.92
Fax : 02/772.92.72

etude@debray.be / kantoor@debray.be

Comptes tiers/Derdenrekeningen:
BE64 1919 5165 6262 BIC CREGBEBB
BE23-0000-2847-8691 BPOTBEB1



197928_10433_1745218

Referte/Référence : 197928 / JD

- 201 –

**RECEPISSE DE DEPOT D'UN ENVOI RECOMMANDE**

**Non distribution :**
Indiquez vos noms et adresse sur l'envoi pour éviter la transmission aux rebuts en cas de non distribution

**Réclamation :**
La production du présent récépissé est obligatoire en cas de réclamation, demande d'avis de réception, etc.

**Perte :**
L'indemnité accordée en cas de perte d'un envoi recommandé est forfaitaire et répond uniquement à l'intérêt que l'expéditeur attache à la remise de son envoi.

Destinataire:      **ABC LEGAL SERVICES**

                   **633 Yesler Way**

                   **SEATTLE, WA 98104 \ ETATS-UNIS D'AMERIQUE**

|  |  | I Taxe : |  |
|---|---|---|---|
| Numéro | : | I |  |
| Nature | : LETTRE | I | EUR |

I Remboursement
I
I     EUR.........................................
I
I
I Signature de l'employé(e),
I
I
I

2 8. 10. 2022

RF 094 806 098 BE

# EXHIBIT C

## Contact

www.linkedin.com/in/apliou
(LinkedIn)

## Top Skills

Animal Models
In Vivo
Physiology

## Publications

A stem cell marker-expressing
subset of enteroendocrine cells
resides at the crypt base in the small
intestine.

The G-Protein-Coupled Receptor
GPR40 Directly Mediates Long-
Chain Fatty Acid-Induced Secretion
of Cholecystokinin

Augmented capacity for peripheral
serotonin release in human obesity

Sugar Responses of Human
Enterochromaffin Cells Depend on
Gut Region, Sex, and Body Mass

Major weight loss tied to microbes

# Alice Liou Fitzpatrick

Associate Director at Fractyl Health
Lexington, Massachusetts, United States

## Summary

A results-oriented biologist with expertise in gastrointestinal
physiology/metabolic disease/liver disease/cachexia/and
inflammatory bowel disease. I have over 8 years drug discovery
and development experience in pharma and biotech environments
advancing early stage discovery drugs towards lead development.
I thrive working in collaborative environments aimed towards
identifying and developing novel therapies to help patients.

---

## Experience

**Fractyl Health**
3 years 8 months

**Associate Director, Gene Therapy Research**
April 2021 - Present (1 year 8 months)
Lexington, Massachusetts, United States

Designed and directed activities to optimize transduction and transfection
screening protocols and functional assessment of primary islets and pancreatic
cell lines.

Designed and directed preclinical activities assessing safety & efficacy, bio
distribution, and mechanism of action of gene therapy in diabetic and non
diabetic animal models.

Support histopathological and clinical assessment of preclinical large animal
studies.

**Principal Scientist, Cell Biology**
April 2019 - April 2021 (2 years 1 month)
Lexington, Massachusetts

Directed activities to develop in vitro (intestinal organoids, primary-cells, 2D
culture) and in vivo models to assess feasibility, safety/efficacy, and proof of
concept studies for gene therapies targeting metabolic disease.

Established and maintained  relationships with local CROs to achieve
screening and in vivo goals in the absence of a biology lab.

Seres Therapeutics
Senior Scientist, Translational Sciences
April 2016 - February 2019 (2 years 11 months)
Cambridge, Massachusetts

* Worked with a small cross-functional team dedicated to screening and
understanding function of Designed Ecobiotics for inflammatory bowel disease
(IBD), metabolic disease, infectious disease, and immuno-oncology programs.
* Lead development and execution of proof of concept, mechanism of
action, and IND-enabling experimental colitis mouse models and gnotobiotic
mouse studies for clinical SER-287 and pre-clinical SER-301 IBD programs.
Experienced designing and executing in vivo studies internally and through
external CROs.
* Contributed in building up internal in vivo capabilities and downstream ex
vivo assessments in gnotobiotic and conventional mouse models.
*Developed primary cell-based and MOA assays in gastrointestinal
(organoids), liver (2d cell lines), and immune cells (pbmcs) to screen effects of
microbial therapeutics and metabolites on function.
* Supervised 2 academic collaborations engaged in understanding mechanistic
role of Ecobiotics on the gastrointestinal immune response in C. dificile and
IBD.
* Directed activities and career development of 1 research associate and 1 co-
op student.

Pfizer
Senior Scientist - Obesity & Eating Disorders
April 2013 - April 2016 (3 years 1 month)
Cambridge, Massachusetts

* Individual contributor in the Central Regulation of Obesity and Eating
Disorders Group  building biology and confidence in rationale for early targets
in peripheral and central appetite regulation. Worked both individually and as
part of an interdisciplinary matrixed team.
*Served as Biology Lead for a cachexia program, advancing an early
stage asset to the next stage gate towards lead development through the
establishment of mouse models and cell-based assays to screen for function,
PK/PD, and human translatability.
* Performed in vivo PK/PD assessment of small molecule and biologic
compounds.

* Used and developed diabetic, obese, and cachectic rodent models to assess MOA of compounds on metabolic phenotype and feeding behavior.
* Developed an ex vivo human gastrointestinal platform (primary cell isolation, Ussing chamber) supporting human biology, pharmacology, and toxicology mechanisms of small molecules.
* Trained and mentored 1 summer student and 1 pharmacology research associate.
* Managed external academic collaboration with 2 established PI labs supporting in-depth understanding of enteroendocrine cell biology. Co-authored internal and external (Australian Research Council) grant proposals that resulted in funding.
* Managed and assured compliance of Group's internal animal use protocols.

Massachusetts General Hospital
Research Fellow - Obesity, Metabolism & Nutrition Institute
July 2010 - April 2013 (2 years 10 months)

* Lead efforts in metabolic phenotyping and understanding contribution of gut microbiota on energy and glucose homeostasis in rodent models of Roux-en-Y gastric bypass (RYGB) surgery.
* Trained and mentored 1 junior research fellow and 3 technicians.
* Awarded NIDDK F32 grant. Experience in data presentation towards both scientific and non-scientific audiences, including with industry partners.

University of California, Davis
Veterinary Scientist Training Program (DVM/PhD) Fellow
September 2002 - June 2010 (7 years 10 months)

Dissertation: "Identification of nutrient chemosensors regulating cholecystokinin secretion in response to amino acids, protein hydrolysates, and fatty acids in enteroendocrine cells".

The National Institutes of Health
Post-Doc IRTA Researcher
August 2007 - August 2009 (2 years 1 month)

————

Education

University of California, Davis
PhD, Molecular, Cellular, and Integrative Physiology · (2002 - 2010)

University of California, Davis



DVM  · (2002 - 2007)

University of California, Davis
B.S., Animal Science · (1998 - 2002)

The University of Queensland
1 year study abroad program · (2001 - 2001)

# EXHIBIT D

Contact

www.linkedin.com/in/lee-kaplan-a266a110 (LinkedIn)

Top Skills

Epidemiology
Molecular Biology
Clinical Trials

# Lee Kaplan

Director, The Obesity and Nutrition Institute, Boston, Massachusetts
Boston, Massachusetts, United States

## Experience

The Obesity and Metabolism Institute
Director, The Obesity Course Online, Boston, MA
June 2022 - Present (6 months)

Harvard Medical School
41 years

Associate Professor of Medicine
1981 - Present (41 years)

Director, Blackburn Course in Obesity Medicine
2013 - August 2022 (9 years)

Massachusetts General Hospital
24 years

Director, Obesity, Metabolism & Nutrition Institute
2011 - August 2022 (11 years)

Director, Obesity Medicine and Nutrition Fellowship Program
2007 - August 2022 (15 years)

Director, MGH Weight Center
1998 - 2011 (13 years)

—————

## Education

Massachusetts General Hospital
Gastroenterology and Hepatology Fellowship · (1984 - 1987)

Brigham and Women's Hospital
Genetics Fellowship · (1986 - 1989)

Massachusetts General Hospital
Internal Medicine Residency Program · (1981 - 1984)

Albert Einstein College of Medicine

Doctor of Medicine - MD, Medicine · (1974 - 1981)

Albert Einstein College of Medicine

PhD, Molecular Biology · (1974 - 1981)